## TWIN CITY FIRE INS. CO. et al. v. FIRST NAT. BANK |OF MARIETTA.

No. 19562. Opinion Filed Oct. 28, 1930.

Rittenhouse, Lee, Webster & Rittenhouse, for plaintiffs in error.

Wilkins & Wilkins and J. H. Hays, for defendant in error.

LEACH, C. On July 6, 1926, the Twin City Fire Insurance Company, through its local agent at Marietta, Okla., issued to Oscar T. Cochran a fire insurance policy for $3,000, describing the dwelling house of Cochran in the town of Marietta, except it incorrectly stated the exact location of such dwelling, to which policy was attached a mortgage or loss-payable clause in favor of the Local Building & Loan Association of Oklahoma City, the mortgagee in a mortgage theretofore given by Cochran on his premises. On January 10, 1927, the National Fire Insurance Company of Hartford, Conn., acting through the same local agent who wrote the Twin City policy, issued to Cochran a $2,000 policy on the same property and correctly described the location of the building. The house was destroyed by fire on April 17, 1927. On August 1, 1927, Cochran assigned the policies with his rights thereunder to the First National Bank of Marietta, who commenced separate actions to recover on each of said policies. The loan association intervened in the Twin City suit claiming an interest in the insurance to the amount of its mortgage by virtue of the mortgage clause attached to the policy and the defendants asked to be subrogated to any recovery had by the loan association. The defendants each filed general demurrers to plaintiff's petition which were overruled and they answered. The two cases were consolidated and upon trial a verdict and judgment were entered for the plaintiff bank, and the defendants appeal.

The defendants first contend that the court erred in overruling their demurrer to plaintiffs' petition, and in not sustaining their objection to the introduction of evidence thereon. Their objection to the petition is that it failed to state the value of the property destroyed.

In the Twin City case, the petition alleged "that the loss sustained by reason of said residence being destroyed was about $5,910 as shown by the estimate of the cost of said house." In a succeeding paragraph it was alleged that the insured served the defendant with an estimate and proof of loss, "a copy of said estimate is hereto attached and made a part hereof and marked 'Plaintiff's Exhibit B'." In an affidavit attached to the exhibit it is stated "that the cash value of said house was, at the time of the fire, $5,910, and the above or foregoing estimate is a true and correct estimate

and statement of the property destroyed and the value thereof." Similar allegations are contained in the petition on the National policy.

"The allegations of a petition must be construed in connection with the exhibits attached and referred to in the petition." Home Ins. Co. of N. Y. v. Whitchurch, 139 Okla. 1, 281 Pac. 234.

"Pleadings attacked by demurrer should be liberally construed in favor of the pleader where material allegations are merely defectively stated and not entirely omitted." Firemeen's Fund Ins. Co. v. Box, 123 Okla. 113, 252 Pac. 433.

We are of the opinion and hold that the allegations of plaintiff's petition, when considered as a whole, sufficiently advised the defendants by express statements therein of the value of the property at the time of its destruction and of the sum the plaintiff would claim its value to be on the trial of the cause. We find no error in the ruling of the court thereon.

The next assignments of error which are presented together are:

"Said court erred in refusing to grant the applications of plaintiffs in error for a change of venue. Said court was guilty of misconduct which was prejudicial to the substantial rights of plaintiffs in error and prevented them from having a fair and impartial trial."

The defendants presented an application for a change of venue, which was also considered as a motion to disqualify the trial judge, based on certain remarks made by the judge in an action pending in the district court of Carter county between parties other than those in the present action, some two and one-half years prior to the date of hearing in the instant case. The statement made in the Carter county case is as follows:

"By this Court: Well, I wish there was a way in this state so people could collect insurance. By Mr. Webster (counsel for defendant): We except to the remarks of the court. By the Court: Just a minute and I will give you an earful. I wish the insurance companies in this state when they come in my court would first come and say 'We don't want to try our cases before you, you will not give us a fair trial,' and I would immediately confess it in order to get the case out for the reason I have never seen—this court never observed yet a legal policy in this court, or when the insurance companies were not trying in some way, and they are trying it at all times, to best the insured, buy the juries, and everything else."

In response to the application or motion presented in the present case, the court stated, in part:

"By the Court: Of course, I made that statement, that is the stenographic report of that part of the proceedings in that case. That is a case tried two and a half years ago—two years ago any way. I will confess into this record at the time I made that statement I was nettled, * * * and many times, I thought, the attorneys for the insurance companies had filed what I considered frivolous pleadings for one delay and another, and finally it did get on my nerves. * * * I realize the purport of that statement and it should not be made from the bench, but because I made that statement in 1925, don't mean I would make it in 1927. I am a little older and a little wiser and a little sadder maybe. I don't think I am disqualified to give an insurance company a fair trial. I know nothing about these insurance cases. That was entirely a different company. * * * By Mr. Wilkins (of counsel for plaintiff): Does the court now feel he is prejudiced against the defendant, or biased in favor of the plaintiff? By the Court: Of course, I will say I am not. I will furthermore say I have no special desire to try anybody's case. I don't think that statement would forever bar this court from trying an insurance case, however, as we progress along through the trial the record will be made, and if you can show where this court does not give you a fair and impartial trial, the Supreme Court will give you a new trial. The motion for change of venue is overruled, and I will also treat it as a motion to disqualify the court and give you an exception."

No doubt at the time the motion to disqualify the court was presented, the honorable trial judge, against whose honesty and integrity no charge is made, felt that he was without prejudice or bias in the cause and that there were no sufficient grounds to sustain the motion. The previous statement of the judge in the Carter county case standing alone would not, as we view it, be sufficient to disqualify the court in the present action, especially so when the same is considered in connection with the response thereto by the court on presentation of the motion.

"An application filed in a civil cause to disqualify the judge on the ground of prejudice or bias is addressed to the sound discretion of the judge, and the ruling will not be reversed on appeal, unless there appears to have been a clear abuse of such discretion." Williams v. Williams, 120 Okla. 12, 249 Pac. 920.

However, it is contended by counsel for appellants that the ruling and conduct of

the court during the further progress of the case, when considered in connection with the previous statement of the judge, is sufficient to clearly show bias and prejudice against the defendants to the extent they were prevented from having a fair and impartial trial.

We find from an examination of the record that the trial court, during the introduction of the evidence, made remarks thereon and examined certain of the witnesses in such a manner as to indicate bias and prejudice, and we are drawn to the conclusion that the trial judge indicated by his conduct and acts his individual views in the matter sufficient to influence the jury to the material prejudice and detriment of the defendants.

Some of the acts and conduct of the trial court complained of, and as shown by the record, are as follows: While counsel for the defendants was examining the assured concerning a previous fire suffered by him, the trial judge interrupted with the following questions:

"By the Court: In answer to some of counsel's questions a while ago about the depreciation in value of a frame house over a period of from 8 to 12 years, I will ask you if there is or is not an increase in the price of lumber over the period of eight or 10 or 12 years?"

Again the court, in examination of another witness (C.-M. 198):

"By the Court: What is the average wage of carpenters? A. $6 to $8. By the Court: What was it ten years ago? By Mr. Lee (of counsel for defendants): We object to that question, or the question of wages ten years ago, it is not involved here. By the Court: The house was built ten years ago. By Mr. Lee (of counsel for defendants): It was bought two years ago, and that is the time the cost of the house has been gone into. By the Court: What was the average carpenter's wage 10 to 12 years ago? A. I hardly remember, I would not be able to answer that question. By the Court: Was it as much as $6 a day? A. I could not tell you."

A Mr. Rubush, who sold the house to the assured, was testifying to its condition at the time he sold it some two years previous to its destruction, and stated that he had papered the house about a year before he sold it, and the court volunteered the following statement:

"By the Court: The testimony shows Mr. Cochran repapered it."

This statement by the court was followed by a statement by Mr. Wilkins of counsel for plaintiff: "Three rooms of it." The same witness was being interrogated concerning the increase in the price of building material since the house had been built, and the court interrupted with the question:

"By the Court: How about the price of labor? A. It is cheaper now than in 1920, and along in there. By the Court: What about it in 1914? A. Higher now."

The same witness was being further interrogated by counsel for plaintiff along the line indicated by the trial court on the cost of labor, and stated in response to the question:

"Q. What is it now? A. $8 in Sherman. (The witness having previously testified that he then was residing in Sherman, Tex.) By the Court: For what? A. Union carpenters."

Counsel for defendants moved that the question be stricken and the jury not consider it because the witness fixed the price at Sherman, Tex., which motion was overruled. While Mr. Kimbley, an adjuster for the insurance company, was being examined by counsel for defendants, and after the witness stated that the kind of building involved depreciated on an average of two or three per cent. a year, the court apparently interceded, and the following shows to have occurred:

"By the Court: For whom do you work? A. Fuller Adjustment Company. By the Court: What is the nature of the services performed? A. Adjusting fire losses. By the Court: Who pays for that work? A. The insurance companies. By Mr. Lee (of counsel for defendants): They pay you—upon what basis are you paid? A. $15 a day and expenses. Q. And regardless of what you adjust the loss for? A. Sure. By the Court: How do you figure your employment, on the best adjustments you can make, that the way your company figures it? By Mr. Lee (of counsel for defendants): We object to that as incompetent, irrelevant and immaterial. By the Court: I will withdraw it. By the Court: You already answered that the insurance companies pay you for your work. Do you look after the interest of the insurance companies? By Mr. Lee (of counsel for defendants): We object to that. By the Court: Overruled. Exception. A. I have adjusted losses when I helped the assured, where I considered he was too ignorant to make up his own claim. I can show you where I helped him make out his claim and pay more than he was asking for. I try to adjust the loss on its merits, every dollar he has coming to him. Q. How long have they been paying you to do that? A. I have been working for

them four years, my present employment three years. Q. In that three years you have made a rule you knock off two and a half per cent. per annum. A. Not on every house. Q. Some. A. Yes, sir. Q. On that basis you are still pleasing your employers? A. So far as I know I am. By the Court: That is all. By Mr. Lee (of counsel for defendants): We now ask that the jury be discharged from further consideration of this case on account of the questions just propounded to the witness who just left the stand. By the Court: Overruled. Exception."

It is the privilege of a trial judge to interrogate a witness within the established rules of evidence, but it should not be done in a partisan manner.

"Courts should scrupulously maintain the right of every litigant to an impartial and disinterested tribunal for determination of his rights; and the judges presiding over such courts should be unbiased, impartial and disinterested in the subject-matter in litigation, and all doubt or suspicion to the contrary must be jealously guarded against, and, if possible, eliminated, if we are to maintain and give full force and effect to the high' ideals and salutary safeguards written in the organic law of the state. (Section 6, art. 2, Const.)" State ex rel. v. Fullerton, 76 Okla. 35, 183 Pac. 979.

In the case of Williams v. Williams, supra, it is stated:

"As the ultimate powers of the courts to enforce their judgments must be made to rest upon the public confidence in the good faith and integrity of the courts, it is implied, and is the concern of the courts, that a case not only be tried fairly, in fact and in law, but in such an atmosphere that neither party plausibly can point to grounds as a support for the charge that the judgment followed from prejudice or bias of the trial judge."

"It is the duty of this court under the exercise of its superintending power not only to secure to every litigant a fair and impartial trial, but also to see to it that it is done in so far as possible in such a manner as will beget no suspicion of the fairness and integrity of the judge. 33 C. J. 988, sec. 128." State ex rel. Garrett v. Freeman, Judge, 102 Okla. 291, 229 Pac. 297.

See, also, State ex rel. Smith v. Brown, Judge, 24 Okla. 433, 103 Pac. 762; Robertson v. Bozarth, Judge, 87 Okla. 102, 209 Pac. 742; Schulte v. Bolen, 90 Okla. 238, 216 Pac. 928; Whitfield v. Walden, Judge, 31 Okla. Cr. 332, 239 Pac. 266; London v. Ogden, Dist. Judge, 130 Okla. 89, 265 Pac. 139; Pressley v. Incorporated Town of Sallisaw, 54 Okla. 747, 154 Pac. 660.

Not every expression of opinion by the court on questions before a jury show reversible error, nor does an erroneous ruling establish bias and prejudice. Atlas Assurance Co. v. Leonard, 108 Okla. 150, 234 Pac. 771; Estudillo v. Security Loan & Trust Co. (Cal.) 109 Pac. 884.

When we consider the assignment of error here presented with the record and in the light of the previous expressions of the court as above referred to and quoted, we reach the conclusion that the defendants did not receive that fair and impartial trial as contemplated under the law, and we are of the opinion that the judgment should be reversed and the cause remanded with directions to grant the motion to disqualify the trial judge.

Other questions are presented which may arise in the retrial of the cause, and we deem it proper to consider them to some extent. The defendants below demurred to plaintiff's evidence, which demurrer was overruled and the court's action thereon is assigned as error. We quote the following from the brief of plaintiffs in error on the assignment:

"As to the defendant, Twin City Fire Insurance Company, the demurrer should have been sustained because there was no evidence introduced by plaintiff sufficient to entitle plaintiff to a reformation of the policy sued on and the policy sued on did not cover the property destroyed."

No argument or authorities are presented in support of the statement, but we will briefly consider the same.

The Twin City policy sued on described the dwelling of the assured as situated on lot 3, block 3, Smith addition to Marietta, while plaintiff's petition and the evidence showed that the dwelling was situated on lot 4, block 8, Highland addition to the town of Marietta. The other policy sued on correctly described the location of the property. Plaintiff alleged, in substance and effect, in his petition, that the assured applied orally to the local agent of the Twin City Fire Insurance Company for insurance on his residence then located on lot 4, block 8 in the Highland addition to the town of Marietta, and such agent did execute and deliver the policy sued on, but through the negligence and mistake of the agent the lot and block where the dwelling was located was incorrectly described without the fault and knowledge of the assured. We deem it sufficient to say that we are of the opinion that plaintiff's evidence supported the allegations of its petition respecting the error in the policy, and was sufficient to warrant a reformation should reformation be held essential to a recovery.

A somewhat similar question arose on a policy of insurance written by the same agent and in favor of the same assured covering household goods located in the dwelling here involved, and the question is more fully discussed and authorities cited in the case of Fidelity-Phoenix Fire Ins. Co. v. First Nat. Bank of Marietta, No. 19561, 145 Okla. 289, 292 Pac. 829, this day decided.

It is next contended that the demurrer should have been sustained as to both companies for the reason that the evidence of plaintiff showed that the assured was not the sole and unconditional owner of the property at any time, and that there was a change in the title and interest of the assured subsequent to the issuance of the policy and prior to the loss complained of by plaintiff.

The policies sued on contained the following:

"This policy, unless otherwise provided by agreement indorsed hereon or added thereto, shall be void, * * * if the interest of the insured be other than unconditional and sole ownership; if the subject of insurance be a building on ground not owned by the insured in fee simple, * * * or, if any change, other than by the death of the insured, take place in the interest, title, or possession of the subject of insurance. * * *"

The record and evidence on the question of title shows that Oscar T. Cochran, who is named as the assured in the policies, together with his wife, Laura Cochran, were the grantees in the deed under which he held title on the dates the policies sued on were issued; that sometime prior to the loss complained of, the assured, joined by his wife, executed a deed to one Hancock, brother-in-law of the assured, and had the deed recorded, but did not deliver it; thereafter Hancock executed a deed to the property to Laura Hancock, and she in turn executed one to her husband, the assured, prior to the date of loss.

The undisputed evidence on the part of the plaintiff respecting the issuance of the policies and the title to the propery was, in part, as follows: Oscar T. Cochran, the assured, as a witness, testified that he had been a resident of the town of Marietta for a number of years and owned a home in the town, and was asked and answered the following questions:

"Q. Do you know Mr. E. L. Shannon? A. Yes, sir. Q. How long have you known him? A. Four or five years. Q. What business is he in? A. Fire insurance and loan business. Q. Who did you get that home from? A. From Mr. Rubush through Mr. E. L. Shannon. * * * Q. You were living in that house during this year? A. Yes, sir. Q. Did you apply to any one for insurance on that property? A. Yes, I did last year. (Witness next identifies the two insurance policies sued on with his assignment thereon.) * * * Q. Those two policies, Mr. Cochran, state now whether or not you made application for insurance on this house that you got from Mr. Rubush. A. When I bought the place, Mr. Shannon told me before we could get a loan we would have to have insurance and I told him to go ahead and write it. Q. Did you get the insurance policy? A. It stayed over there. At his office. Q. Is that the policy? A. One of them. Q. Where did the policy stay up to the time of the fire? A. With Mr. Shannon, in his office. Q. Mr. Shannon or not familiar with the location of this property? (Question objected to and not answered.) Q. Did he know the location, had he been there? (Objected to, no answer.) (By the Court: Had he been on the property? A. Yes, sir, he had.) Q. Knew where it was? A. Yes, sir. Q. I will ask you if you know the description of the lot and block of that property? A. Yes, I do. Q. State what it is. A. Block 4, lot 8, Highland addition to Marietta. * * * Q. Look at that policy, Mr. Cochran, what does that describe? A. Lot 3, block 3, Smith addition. Q. Is that a correct description? A. No, sir. Q. Who put that in there? A. Mr. Shannon. Q. When did you learn that description was in there as it is? A. Not until after the fire. Q. When did that occur? A. The fire, on the night of April 14, 1927. * * * Q. The house, where was that house when it burned with reference to being in the same place as it was when it was insured? A. Same place. Q. Had you paid the insurance premiums on these policies? A. Yes, sir. * * *"

Cross-examination:

"Q. Well, do you know where Shannon got his description to put in these policies? A. No, sir. Mr. Shannon drew this deed up also. Q. He did not have that deed in his possession when you took out these policies? A. No, sir. Q. On the 26th day of August, 1926, in a deed of that date did you deed this property to some one else? A. Yes, to A. B. Hancock, my brother-in-law. Q. And you and your wife signed that deed? A. Yes, sir. * * * Q. You delivered that deed to Mr. Hancock? A. No, sir. Q. Why did you place it of record then? A. You allow me. I will go back and explain it. By the Court: Go ahead. A. During August, 1926, the Oklahoma Building & Loan Association sued me on a piece of property I bought in the east part of town, and I saw Mr. Wilkins one night after supper and asked him to draw me a deed, and asked him if they could get a judgment against me, I said I assumed something I did not think about, and I told him that being the fact I wanted him to draw me a deed conveying my property to my brother-in-law, and he said he would draw it that night, and the next day

I found it would taken them six or eight months to foreclose the mortgage so I let it ride at that time. Q. That is the reason you and your wife later on signed up this deed? A. Yes, sir. Q. In April this year you say? A. Yes, sir. Q. To make the record show you did not own the property? A. Yes, sir. Q. And the record still shows you don't own the property? A. It shows it in my wife's name, but I own it, I have a deed to it. * * * Q. Now, you say your policies were kept by Shannon, why? A. Just the way he usually does business with all his customers, he keeps them for conveniences. Q. While he was keeping these policies up there after he had written them for you, he was doing that for your acommodation? A. I guess I could have gotten them if I had called for them. He said he had a safe and would keep them for me."

Redirect examination:

"Q. Was the deed you made to Hancock ever out of your possession, except while it was being recorded? A. No, sir. Q. What was the purpose of this deed to Hancock, in other words, did you intend to convey title to any one or not? A. No, sir, I did not. * * * Q. Were you in possession at that time? A. Yes, sir. Q. Ever get out of possession? A. No, sir."

Re-cross examination:

"Q. You were asked about the purpose of the deed from yourself and wife to Hancock, what was the purpose of it? A. To convey the property. Q. To get around this judgment? A. Yes, sir."

While the policy involved in the case of Murphey v. Liverpool and London and Globe Ins. Co., 89 Okla. 207, 214 Pac. 695, covered personal property, we consider the statement and rule therein announced applicable to the facts and controlling in the present case. It is stated in the syllabus of that case:

"Where an owner in possession of personal propery incumbered by chattel mortgage made an oral application for insurance thereon, made no representations concerning his title, and the insurer made no inquiry about the condition of the title, and no fraud appears, held, that the insurer will be presumed to have insured the property upon its knowledge of the condition of the title and to have waived all provisions in the policy providing for its forfeiture by reason of any facts or circumstances (such as incumbrances) affecting the title of the property insured."

—while in the body of the opinion, it is said:

"The admitted facts in the case at bar show conclusively that the plaintiffs concealed no fact from the defendant, but applied and paid the premium for the insurance in the utmost good faith, and there is no intimation from the facts as agreed to that the plaintiffs had any intention of concealing any facts from the defendant. Furthermore, it appears from the admitted facts that the defendant accepted the money of the plaintiffs, having been advised just what interest each of the plaintiffs had in the property, and agreed to mail the policy to the plaintiffs. The admitted facts show that the loss was an honest loss. The statute does not forbid the defendant from insuring mortgaged property, but only provides that in the event the subject of the insurance be personal property and be or become incumbered by a chattel mortgage, the agreement to insure such property shall be indorsed thereon. Evidently such a provision in the policy is for the benefit of the insurer, and such provision may be waived. The rule seems to be well established and supported by many authorities, that, where the insurer issues a policy upon an oral application without making any inquiry as to the nature of the title to the property insured, the presumption arises that the insurer has written the policy on its own knowledge and thereby waived the condition which would have invalidated the policy. Humble v. German Alliance Ins. Co. (Kan.) 116 Pac. 472, 137 Pac. 980; Neher v. Western Assur. Co. (Wash.) 82 Pac. 166; Insurance Company v. Bohn, 48 Neb. 743; Great Southern Fire Insurance Co. v. Burns & Billington (Ark.) 175 S. W. 1161; Farmers' State Bank v. Tri-State Mutual Grain Dealers' Fire Ins. Co., 41 S. D. 398, 170 N. W. 638; Peter Gregerson v. Phenix Fire Ins. Co. (Wash.) 170 Pac. 331, L. R. A. 1918E, 521; Georgia Home Ins. Co. v. Homes, 75 Miss. 390.

"In the case of Farmers' State Bank v. Tri-State Mutual Grain Dealers' Fire Ins. Co., the Supreme Court of South Dakota approved the rule announced by the Supreme Court of Nebraska in German Insurance & Sav. Inst. v. Kline, 44 Neb. 395, 62 N. W. 857, as follows:

"'Where insurance company issues its policy, and accepts and retains the premium, without requiring an application by the insured, and without making any inquiry as to the condition of the property or the state of the title, and the insured has in fact an insurable interest, the company will be conclusively presumed to have insured such interest, and to have waived all provisions in the policy providing for its forfeiture by reason of any facts or circumstances affecting the condition or title of the property in regard to which no such statement was required or inquiry made.'"

"Where insured has made no representations that he was the owner of the land upon which the building insured was situated, the company, by accepting risk without making inquiry, is deemed, in the absence of fraud, to have waived a condition that the policy should be void if the building insured is not located upon ground owned by insured in fee simple."

See Gregerson v. Phenix Fire Ins. Co. (Wash.) 170 Pac. 331.

See, also, State Mut. Ins. Co. v. Green, 62 Okla. 214, 166 Pac. 105; Am. Ins. Co. v. Jueschke, 110 Okla. 250, 237 Pac. 585; Crossman v. Am. Ins. Co., 198 Mich. 304, 164 N. W. 428, L. R. A. 1918A, 390.

The above authorities and established rule therein announced, when applied to the admitted facts in the present case, are sufficient to establish and show that the insurance company here cannot avoid liability under the clause that the policy shall be void if the interest of the insured be other than unconditional and sale ownership.

It is further contended by the plaintiffs in error that the evidence showed a change of title or interest in the assured by reason of the deed executed by himself and wife to his brother-in-law, and that such facts voided the policy under the following provision therein:

"This policy * * * shall be void * * * if any change, other than by the death of the insured, take place in the interest, title, or possession of the subject of insurance."

Plaintiffs in error rely on the holding of this court in Phoenix Ins. Co. v. First Nat. Bank of Stilwell, 129 Okla. 204, 264 Pac. 142, and say that the facts in the present case come squarely within the decision in that case. We do not consider the holding in that case controlling in the present one because of the difference in the facts. In that case the party named as assured in the policy sued on conveyed the property, which was not his homestead, to his wife in fraud of creditors, and she exercised control over it by obtaining a policy of insurance thereon and collected a portion of the insurance after the building was destroyed. There is nothing indicating the deed was not delivered to the grantee. After conveying the property to his wife, the assured executed a mortgage on the property to a bank who obtained the policy of insurance sued on in the name of it mortgagor with mortgage clause in its favor, such policy being written by the cashier and stockholder of the bank who was also local agent of the insurance company. It was there held that the mortgagor and bank had no insurable interest in the property. In the instant case the property involved was the homestead of the assured; he continued in possession of the same and held an insurable interest therein during all such time. The deed in favor of Hancock was without consideration and never delivered to the grantee. Han-

cock had reconveyed the record title to the wife of the assured, and she had executed her deed to the assured prior to the destruction of the dwelling. The admitted facts in the instant case bring it within the rule announced in the following cases:

"Where a deed is made without consideration, and placed by the grantor upon record, and after the deed is recorded it is returned to the grantor and never delivered to the grantee or any one for him, and the intention of the grantor in making the deed was not to pass title to the grantee, but to place the property where it could not be reached for a legal liability of the grantor, and the possession of the property continuously remained in the grantor, there was not such a delivery of the deed as is necessary to convey title thereby to the grantee, and such grantee is not entitled to recover such property of the grantor.

"A deed does not take effect or operate to pass title until it is delivered." Belky v. Terrell, 93 Okla. 134, 219 Pac. 887; King v. Antrim Lumber Co., 70 Okla. 52, 172 Pac. 958.

In the syllabus of the case of Hankins v. Williamsburg City Fire Ins. Co. (Kan.) 153 Pac. 491, it is stated:

"A fire insurance policy upon a building, containing a stipulation that the policy 'shall be void * * * if the interest of the insured be other than unconditional and sole ownership,' is not invalidated because of an outstanding naked legal title in another where the insured has the equitable title, the entire beneficial ownership of the property, and is in undisputed possession of the same"

—and in the body of the opinion, the court, in referring to record title holder, said:

"The deed was never delivered to her nor did she ever assume to take possession of the property."

See, also, Whitney v. Am. Ins. Co. (Cal.) 59 Pac. 897.

Under the record presented we find no error in the action of the court in overruling the demurrer to plaintiff's evidence.

For the reasons hereinbefore stated, we are of the opinion that the trial court should have granted the motion to disqualify the judge on account of bias and prejudice, and, for such reason alone, the judgment is reversed and cause remanded for further proceedings in accord with the views herein expressed.

BENNETT, TEEHEE, REID, and EAGLETON, Commissioners, concur.

By the Court: It is so ordered.